The next matter is United States vs. Quality Formulation Laboratories. Mr. Solano, good morning. Good morning, Your Honors. May it please the Court, my name is Ricardo Solano, and I represent the appellant Ahmad D'Souky in this matter. With me at counsel's table is Mr. Gonzalez, who represents Mohamed D'Souky, and the corporate defendants, and Ms. Van Hoek, who represents Omar D'Souky. We've divided our time, Your Honor, and as I've informed the crier, we've reserved three minutes for rebuttal. All right. Divided equally. I'm going to begin, Your Honors, by addressing the summation issue that was raised by counsel below. Well, the term, you know, the term disgusting was not called for, but really wasn't the attack on the tactics of the government. I don't think that they were, Your Honor, and for this reason, not to get too philosophical, but I think your actions are who you are, and by calling the defense approach of attacking the credibility of a key government witness, whether the government acknowledged it or not, calling that tactic disgusting is to suggest that the defense counsel acted in a way that's disgusting, unethical, and went a little bit beyond that because the government's attorney at that point, and this is all occurring in rebuttal, said they didn't have the decency of calling him a liar to his face. And, in fact, one of the prosecutors even said, my mother always told me you have to call someone a liar to their face. And the suggestion is that there's a violation of a rule of evidence, and I think that the government's brief on appeal and their arguments to Judge Brown suggest that maybe they do really believe that because one of the arguments was you have to confront the witness on the stand. That's not the rules. No one's ever argued the rule. There's no court rule that says you can't, in summation, stand up there and tell the jury this witness said A, the fact shows B, he lied. The court has taken exception from time to time when the government goes a step further and characterizes somebody as a liar. But, to be fair, in the record, it was the government's attorney in rebuttal that kept accusing the defense counsel of calling Mr. Baloo Advani, who's the witness in question, a liar. Defendants used the word that he lied. I'm sorry, defense counsel used the word that he lied. But the focus of the summation was that he didn't tell the whole truth. And there was evidence to support that, that he didn't tell the whole truth. I can get into why he didn't tell the whole truth. Very briefly, it had to do with this whole case really came down to the defendant's intent. He had a civil consent order that prohibited certain conduct. You had the defendants then being accused of having engaged in certain conduct that the government characterized as manufacturing in violation of that consent decree. Much of that conduct was not in dispute. There was no dispute that the defendant's product that they had previously sold was found in another facility. There was no dispute that some of the prior employees of the defendants were at that facility. There was no dispute about payments. The whole case came down to credibility on the intent issue and whether or not the defendants had been paid. So there's no dispute that you were subject to a consent decree where you had to remediate a number of conditions. And there's no dispute that you had to leave or close the facility within 45 days. You couldn't engage in the same conduct until you got essentially permission from the FDA, FTC I think it is. The FDA, Your Honor. FDA? FDA. Okay. So there's no question about any of that. So you could not engage in any similar activities anywhere. And that's correct, Your Honor. And the issue became whether or not the defendants, the conduct that was alleged, was engaging in that activity or whether they had a good faith belief that under their reading of the consent decree this was what was called a third-party manufacturing where they were another company, ADH and Mr. Ballou, were producing the product. And I mention that because Say that again. A good faith belief in A good faith belief that under the consent decree a third-party manufacturing I see. The defendants' own product was permissible. You weren't doing it. Somebody else was doing it for you. Correct. And I'm not To be fair, there was evidence back and forth that the government argued was inconsistent with that. There was a lot of evidence that the defendants presented and one of the defendants testified that was consistent with that. And the jury made the call. I mention this as a background to Judge Sirica's initial question of why did the disgusting matter so much. And it matters so much because this is not a case in which there was overwhelming evidence of acts. And I say that because simply proving that this product was found at a facility in New York wasn't the crime. And we didn't seriously contest that. I thought, in effect, what the government was attempting to show at the trial is, look, there were two paths to deal, two courses, parallel, perhaps, to deal with this problem. They were having to shut down Patterson. They agreed to shut down Patterson. So they're going to do whatever they can to try to get Patterson up as quickly as possible. In the meantime, they've got contracts that they have to deal with. And they run the risk of being put out of business. And therefore, you know, the government is saying, despite the fact they've entered into, they'll give notice to the FDA they didn't, and they went up to Conjures New York and they tried to do and run. Isn't that the government's, in effect, what they're trying to show at trial? That is, Your Honor. But the defense was that that second part of it was permissible because under their good-faith interpretation. The defense was it was permissible. Correct. And the government's saying it wasn't, and they prevailed with a jury. Correct. But the problem is that when, and again, this goes back to the initial question that Judge Jirica asked, and I started out with the summation point. Accusing the government of being disgusting. I'm sorry. Excusing defense counsel of being disgusting. Suggesting, or their tactics. Suggesting that the way they went about attacking the credibility of the government witness, Mr. Advanti, was disgusting or that there was something improper, was not only improper, and the government doesn't concede. They think. Although if you're a juror, that sort of just, you know, at the end of a law, that kind of rolls off, doesn't it? Here's why it doesn't, Your Honor. Because on that key issue of the good faith, it was a dispute, or it was a conflict in the testimony between how Mr. Amatisoki presented the facts when he testified in his own defense. And the facts were that there was this third-party agreement that that was the arrangement that was set up at the New York facility. On the other side, the only person that could directly refute that, other than circumstantial evidence, but the direct individual government witness that refuted that was Mr. Advanti. And it was about him that this disgusting comment comes in. Mr. Advanti testified that there was no third-party agreement, that this was actually a lease arrangement. The defendants, in closing, attacked his credibility on that. And they attacked his credibility on what I would submit is a fair record. He never produced a lease agreement, or he produced an unsigned copy of the lease agreement. The first bill for rental payments occurred after the activity was exposed. He had a motivation. He didn't want to be – he sells a product that's regulated by the FDA. He didn't want to get into trouble with the FDA. And most importantly, he met with the FDA investigators a number of times and never once bothered to tell them that he had signed a third-party agreement to manufacture. The defendants, as part of our reciprocal discovery, for the first time after the defendants are charged, turned over this product, and that's the first time the government finds out about it. So in defense closing, it was perfectly fair for the defense counsel, and each of us did this in various forms and to varying degrees, to say Mr. Advanti didn't tell you the whole truth. He's got a motivation not to because he doesn't want to get in trouble. And he hid key evidence from the government. Mr. Advanti testified that he never turned this over because he didn't think the FDA was concerned about this product, wasn't interested in this. That's just not credible. The evidence in the trial was pretty damning, I guess, from the government witnesses in the sense that they had the Patterson facility under surveillance. They went to the Conjures facility in New York and saw that there was a plastic curtain that separated the defendant's production or facility from the AHD, I think it is, or ADH. So there was a separation of activities, and also the employees of the defendants were being paid under the table. So there was a lot of evidence before the jury, and the judge made a decision that the evidence of the expert testimony would only be confusing and would not be relevant, essentially, if I'm not mistaken, because the defendants never got authorization to operate in Conjures, New York, or anywhere else. So why was that? And, of course, the standard is abuse of discretion. Why was that an abuse of discretion? Your Honor, respectfully, that's an issue that Mr. Gonzalez will address. I don't want to leave the Court's question unanswered, though, because I think it's important. Okay, I'm sorry. I thought you were addressing good faith, so I thought you would be. I was addressing the summation issue and why the good faith mattered. I will, because I was there and I was one of the trial attorneys, tell you that one of the reasons that that matters so much is because when it comes down to good faith, the acts with this individual, the expert, are consistent with a belief that what you're doing is permissible because you wouldn't expend that kind of money. It doesn't excuse illegal conduct, and I think that's where Judge Brown saw it as, well, you want to say because you did some things right, you could do some things wrong. And, frankly, that was never the argument. The argument was very straightforward that our position or the defendant's position is everything they did, they did with a good faith belief. That expert corroborated that evidence or that defense through inferences, and it was probative of that defense in the following way. You would not hire an expert, you would not go through all the steps, the effort, the expense, if all you were going to do was engage in illegal conduct, and it corroborated it. And Judge Brown found that at one point he said, you know, what I said earlier, that not doing some things right doesn't mean you can do some things wrong. That wasn't the point. It was critical because the defendant did testify in his own defense and did explain that, but surely the court can appreciate that that's a different perspective coming from a defendant who's got a motive, unlike anybody else in the courtroom, and coming from an expert witness who's unbiased, objective, and can say, as a matter of fact, because she wasn't going to testify necessarily as an expert, it was more about what she had done as an expert factually. As a matter of fact, say, I did all these things. And that sort of went to the good faith defense. I see that I've exceeded my time, but if I could, on the summation question, to get back to that, there was a lot of evidence, and Your Honor characterizes it as damaging evidence. But at the end of the day, and you have to take both the government's case and the defense case, it really came down to intent and the defendant's good faith. And the problem is that when it comes down to these kind of cases, and these are the kind of cases where improper argument during summations are at their worst and have the most impact, right, because if you had eyewitness testimony and the issue was did you rob the bank, less of an effect. The eyewitness testimony is always going to take precedent there. Here you had an issue of intent, which nobody can get into their mind, so it's always going to be circumstantial. And when you have the government say things like disgusting, suggest that they violated rules, and then there's some mischaracterizations of the evidence. They suggested there was a recall. That was corrected. It was, although it was corrected by... And it happens in every trial. There are mistakes like this, and judges issue curative instruction. And I don't disagree with that, Your Honor, that it happens. And I don't think, to be fair, that I would have an argument if there was only one. But I would suggest that there is more. There's a disregard that's reckless of the record, because it is the recall versus a voluntary return. And recall has a certain connotation in the FDA world, unlike in any other. I understand. There is the idea that the recall, they called it a reorganization and suggested the defense counsel acted improperly in their closing, not even touching upon the fact that they reorganized. That also got corrected because there was never charged with reorganizing. It was actually a relocation. Those are multiple instances of misstating the record. There's the common amount, Mr. Omar DeSilke, saying, oh, no, I need a lawyer, or I want to talk to my lawyer. Again, in and of itself, is it power phrasing what he actually said? I would say it's a stretch to say that it's power phrasing, because what actually happened is Omar's, there was a lawyer there who asked him clarifying questions. Then Omar talks to him, Mr. Omar DeSilke talks to him, and then records are produced. He never said, oh, no, I need to talk to my lawyer. All those things together show, one, by the government, a complete disregard for the actual facts. You should be more careful, any lawyer should, when the government is trying to take somebody's liberty, they should certainly be more careful. The consent, I'm sorry. I'm sorry, go ahead. No, I just wanted to clarify. The consent order that was filed essentially put a halt to the defendant's operation in Patterson, didn't it? It did. It gave you time pretty much to remediate the conditions that were found problematic. It did. But subsequent to the shutdown order, there were activities in Patterson. That was an issue that was... that there were receiving orders, that there were shipments that were going out. So when you say good faith, could you put that in context? Good faith to do what? The order said that you had to close down, and you didn't. So when you say good faith, do you mean good faith to clean up the problems that were there or good faith to continue in business? Good faith to continue in the activities, which I would respectfully not characterize as being in business, but good faith to continue the activities. I'm trying to put myself in the context of the district judge that made a ruling on the expert report, and I'm wondering whether that was an abuse of discretion or not. So I'm trying to understand your good faith argument. I understand that, Your Honor. Those activities, the argument was, were all consistent with their belief that the consent decree didn't prohibit that, that the consent decree prohibited the manufacturing. And I would say, and I'm not... It did not prohibit what? It did not prohibit the receiving of products. It prohibited the whole manufacturing process, which... So they understood it to mean there were some things that they could do but some things that they could not do. Correct, Your Honor. And I won't go into my entire closing to the jury because I'll spare the court, but one of the issues that came up is that there were two unannounced inspections where FDA inspectors showed up, and they never... You would expect that if there was this manufacturing that you'd find people walking around and working. There was evidence of orders that came in, but there was never any evidence that there was actual manufacturing going on in the Patterson facility. Well, the order said receiving, manufacturing, preparing, packing, labeling, and distributing. That's a pretty comprehensive list of things that you couldn't do, but... It is. But the defense theory on that was that the order prohibited the manufacturing, which requires all those components. And the real problem with this facility, to be fair, was conditions at the plant and whether or not they were appropriate for manufacturing a product and that you would put into the stream of commerce. And so our defense is simply receiving a product, if you don't manufacture it there at the place that's the locus of the problem, doesn't address the concerns that were raised by the consent decree. Thank you. Thank you, Your Honor. Thank you very much, Mr. Salone. Mr. Gonzalez. Good morning. Good morning, judges. My name is Marco Gonzalez, and I represent Dr. Mohamed Dasoki and the corporate defendants. And I'm here to address the reverse Rule 404 issue that my colleague talked about briefly in response to some of your questions. I'd like to correct a possible ambiguity here regarding the consultant that was retained in order to comply with the consent decree. She's not an expert witness. Her introduction as a witness was not as an expert but as a fact witness to discuss all of the work that was being done to comply with the consent decree. And I should also add, and it's in the record, this consultant was vetted through the FDA and approved by the FDA. Let me just ask you at the outset. I asked Mr. Solano, and he agreed that, in effect, that the government theory was that there were parallel paths. One, let's try to get Patterson up and running and do what it takes, for example, to bring Ms. Richardson in. And two, we've got to keep active in connection with what we currently have on our plate and we have to satisfy. And they did something with respect to Conjure's New York, the facility of someone that they knew, and they didn't tell the FDA. That's the government's theory. That's correct, Your Honor. Ms. Richardson has nothing to do with the second part of that theory. She has only to do with the attempts to get Patterson up and running. But it goes towards intent, Your Honor, and I think what the judge did in the district court was focus on actions versus the defendant's intent. I'm not going to put words in the government's mouth, but they're going to say no. That may be their intent. They also had a second intent, which is to keep satisfying the contracts that they have through activities that violated the consent order via what they did in Conjure's New York. So, right, they may have had that first intent. They also had another intent. But, again, they had their intent goes to wilfulness. And they had, even though their belief may have been mistaken, if they thought that they were complying with the consent decree, that those activities were, in fact, legitimate under their reading, then her testimony would have been very relevant for the purpose of Reverse 404B. And that's where I think it's important because it goes towards intent, and the court did not look at it that way. We looked at it from the perspective of probably good acts or character evidence. And then because of that error, resubmit, that had the court looked at it from the perspective of intent. What kind of evidence did you put on a trial of good intent? Well, one of the things that Ms. Richardson would have testified is all of the things that they were doing that were inconsistent with defendants purposely violating this consent decree. And the jury should have been entitled to that. Yes, there was. Ahmad De Stokey did testify briefly on that. Ms. Estrada did testify briefly on that. But with regards to Ahmad De Stokey, he's entitled to present corroborating testimony. And also, Ms. Estrada was a mere clerk. She did not know the intricacies of what was being done to satisfy the consent decree. And when you pass the purpose aspect under Reverse 404B, then you get into the issues of relevancy, the balancing of the factors of the My point is, couldn't your client have been complying with the consent decree 100% as to the Patterson facility violating it as to the work with ADH? They did not think they were. They had a reasonable belief that that wasn't the case. And all of the work that they were doing with Ms. Richardson should have come in. How much did you put in absent Ms. Richardson to say that they did not think that they were violating the consent decree? They would not have expended the millions of dollars that they expended, all of the efforts at the facility, and the work that they did with Ms. Richardson, if they thought that they were violating the consent decree. And willfulness isn't an element of the offense. And the jury should have had that benefit. But the expense there was to clean up the problems that the federal agency found. In other words, they said, look, this is what you can do to restart, to reboot your program. Hire a sanitation expert or a cleanup expert, whatever it's called. And isn't that the reason why she was hired? She was hired for a bunch of things, Your Honor, and they're all spelled out in the consent decree. But remember that the judge focused, and I think part of the government's argument against Ms. Richardson was that they were going to have these mini-trials about the status of the facility. But that was all dealt with in the civil consent decree. That was a settlement that took place. All that was in the consent decree itself, and it was one of the first exhibits in the trial. But that's different from the intent side of things, and her testimony would have been appropriate on the willfulness side to negate that as reverse 404B evidence. But the court didn't get into the relevancy aspect, the balancing aspect because... Can I stop you there for a moment? Sure. Because it was my impression that you get to the relevancy aspect before you get to 404B. I mean, in order to qualify as 404B evidence, it has to be relevant evidence. Well, I think it's relevant because it has a tendency, more probable than not, to show that defendants would not have engaged in this conduct if there was willfulness there. And my understanding in U.S. v. Hayes and Gaven, Jivon case, is that the court there looked at whether there was a purpose first. And then once you satisfy that threshold, you go into relevancy, the balancing of the factors under Rule 403. And if there's still an issue there regarding prejudice, then the appropriate remedy is to give a limiting instruction and not to exclude that evidence. And that was not done here, Your Honors. Any other questions? Mr. Gonzalez, thank you very much. Ms. Van Hook? Good morning. I'm going to tackle the remaining issues in our brief and focus primarily on the jury charge and the errors that the defendant assigns to those. Before I get there, because all three of these issues really center around the same critical fact, that is that this case boiled down to whether or not each of these individuals had a good faith belief that they were abiding by the consent decree. And good faith is a subjective, and it's an honest belief. So regardless of what it may look like with a plastic cloth or whose employees were there, there was testimony put on. Through the testimony of one of the defendants themselves, Mr. Ahmaud D'Souza testified. He testified at length as to specifically what they did with regard to cleaning up the facility, but also how they tackled the problem of potentially ending a 30-year business. What is it in the instruction that you're having a problem with? We assign an error to two aspects of the instruction. The first is that the instruction limits the good faith defense to any – rather, it makes the good faith defense unavailable if, in fact, a defendant is found to make a misrepresentation or an omission. The court's instructed that a person acts in good faith even if he has an inaccurate or incorrect understanding of the court order. And so that part, obviously, you agree with, right? Yes, Your Honor, and on page – the actual sentence is later where it says, even if a defendant has an honest misunderstanding of the argument, he nonetheless is not entitled to the defense if you find – basically in the alternative – if you find that he's told a lie, made a misrepresentation or a material omission. Why is that a problem? I mean, how could you have an honest misunderstanding if you also tell a lie? Aren't they inconsistent? Respectfully, no, Your Honor. First, that language isn't a problem in certain types of cases in which the good faith is available as a defense. And specifically, you contrast a tax case with an intent to defraud case. An intent to defraud case, you can honestly believe that a business venture is going to succeed, but in the course of your attempting to get others to join that venture, you tell misrepresentations. Then, obviously, you're not acting in good faith because you're attempting to deceive them. Then, obviously, you're not believing what you say. In a tax case, you never find that language. And that distinction is drawn in O'Malley. Tax case is a very complicated type of transaction. It is, Your Honor, but I believe that this case is closer to a tax case because the element is, in fact, that you must know the specific order in which you're violating. You must have notice of that order, and you must violate that order. Let's assume that we don't think that the tax cases are the proper way to look at these. What is your argument? Even if you don't think the tax case is the proper way to look at it, the distinction between a tax case and another case with willfulness is simply that you don't have to know the specific provision that you're violating. In the Third Circuit's decision in Starnes, there's some lengthy discussion about the different types of cases where willfulness is the mens rea. And the only distinction, you still have to know if it's charged willful and knowing, which it was here. But isn't Starnes limited to those, quote, rare instances involving highly technical statutes, close quote? That is what the government purported that Starnes holds and that this is not that case. I'm quoting from Starnes on page 210 to 11. But what that part of Starnes is quoting is whether or not you have to know the specific statute. The case goes on to explain that if it's not a complex case, you still must know that your conduct is somehow unlawful. That decree was pretty much written in plain English. I mean, what was so abstruse about the consent decree here? It didn't prohibit third-party manufacturing, which was a very prevalent industry standard. Nearly every witness testified of how popular that was. It was not included. To avoid a consent decree. So much for technology. Thank you. The consent decree, I'm looking at paragraph 7. It says that they're permanently restrained and joined from any activity at their plant in Patterson or any other street addresses and any other locations or any new locations at which they receive, manufacture, prepare, pack, label, et cetera, articles. And they shall notify then, paragraph 15, they shall notify the FDA in writing at least 30 days before any change in, among other things, the character of their business, including relocation or that may affect compliance with the obligations. I mean, it sounds like at the very least you have to go to the FDA and say, hey, we've got to fulfill these contracts. We propose to go to someone we know in Conjures, New York. Is that okay? Respectfully, there are two separate elements to a contempt charge in this context. And one is, is the order unambiguous? The second is, was your violation willful? And willful has a subjective component. What's ambiguous about the order? Assuming that it's not ambiguous, it still must, even a defendant, a defendant who makes a mistake, if it's an honest, subjective mistake, is not guilty of the offense because it has willful mens rea. No, I understand that. But you're saying the ambiguity in the order is that it doesn't specifically prohibit their party contracting. Your Honor, I would not characterize that as an ambiguity. What I was trying to say, and I'm sorry if I misspoke, is that the reason why the good faith defense was not a joke. It was actually something that was considered by the jury. Indeed, they asked for very little, but they asked for Ahmad D'Souky's entire testimony. And he answered and explained in every instance why they believed this was not in violation of the contract. So the question is, maybe to us, you would say, well, manufacturing might include a variation called third-party manufacturing. But to the D'Soukys, who have been in this business for their entire lives, and this is indeed an industry standard, this is what is very, very common in that industry, they were third-party manufacturers. The absence of that. Is it so that you got in the good faith defense without the, not an expert, but the witness? The fact witness, the expert as a fact witness. I mean, it's an interesting question. I submit that the answer is no. While, I mean, yes, we did, with respect to Ahmad D'Souky, because he testified to everything. I mean, did the jury have an opportunity to consider that issue? Yes, they did. They were charged with that. One of our arguments is, of course, though, that the good faith charge took that away from them by saying that even if they honestly believed that they were abiding by the consent decree, if you found that they made any misrepresentation or omission of an unspecified nature on an unspecified topic, they weren't entitled to that defense. So given the charge, and also- But you could have argued to the jury that there were no misrepresentations, there were no omissions. We did, but I think that what that does is it inserts a principle that's only important in a court of equity. It's almost unclean hands. You can believe that subjectively they did not believe they were violating the law, so therefore they have no willful mens rea. But if you thought he lied about a few things along the way, then we're going to take that back and you can convict him on that alternative ground. My time is well up. I could discuss the sentencing issue if you're interested, or I can- Any questions? No. Okay. Thank you. Sentencing issue. Who's doing rebuttal? Okay. Okay. Good. Thank you very much, Ms. VanHook. Mr. Runkel. Good morning, Your Honors. May it please the Court, my name is Patrick Runkel. I'm here today on behalf of the United States. I'd like to handle the issues in the order that they were presented in the defendant's brief, and I'll start with the evidentiary issue that was presented by Mr. Gonzalez. On this issue, I think that, as Your Honors pointed out, we're in abusive discretion land here, and the defendants have not met their burden of showing that Chief Judge Brown's, former Chief Judge Brown's, ruling on this was arbitrary or irrational, as they must. This consent decree, as I think Judge Amber was alluding to, it essentially has two sets of provisions in it. There's one set that are the affirmative prohibitions and prescriptions that go into effect as soon as the consent decree is entered by the Court. There's also this voluntary path that QFL could have chosen to go forward with in order to receive FDA authorization to resume operations. That path, they started down that path, but the fact that they started down that path not only is irrelevant to their That path, depending on the way you count it, there's about 20 different steps that QFL would have had to have taken to get to the point where FDA, in its discretion, could have given them authorization to resume operations. And at that point... What was the initial problem with the Patterson plant, by the way? There were a number of problems. There's evidence, there's scant evidence in the record about this because we didn't want to put all that on, but the evidence that is in the record is that there was a rodent problem there. The evidence that's also in the record is that there were labeling problems with their products such that there were allergens in the products that were not labeled on the labels, and there were the opposite, which is there were things on the labels that weren't in the product. Those were the primary problems that caused the enforcement action. There was also... The consent decree covers this. There was also a cross-contamination issue where there was the potential for allergens from, for instance, a milk-containing product. Because there wasn't adequate cleaning between the batches, there was potential for allergens in a milk-containing product to make their way into a subsequent product that wasn't supposed to contain milk. Those were the issues that led to the enforcement action. And there's a substantial, obviously, there's a substantial administrative record here. Now, in connection with the testimony of Ms. Richardson, the government's reason for opposing that was what? The government's reason for opposing it, the way it arose, was when the defense made its Rule 16 disclosures in fall of 2010. And what happened then is that they gave us about 300 pages of kind of bills and other sort of, some of them very small bills about cleaning up the plant and other kind of contractors they had hired. And we decided at that point that essentially none of that sanitation evidence was relevant, not the evidence that the government had about the rodents and not the evidence about cleaning it up afterwards, because the consent decree resolved all of that by, you know, making the party's intentions clear. So we moved at that time to exclude the sanitation evidence and the... But that's how it arose. And Judge Brownholder held a... held an extensive oral argument at that time and ruled that this evidence was generally not relevant to the contempt charges. What was the argument made that the evidence was essential to the defendant's willfulness requirement? Well, there was an... The issue of mens rea generally, which seems to be the heart of the defense. There was an argument made then that this evidence had something to do with whether the defendants wanted to, you know, that their intent in cleaning up the plant was inconsistent with their intent in going somewhere else to violate the decree. And Chief Judge Brown considered that issue. And he decided that the two simply didn't meet, that there was... Even if there was an attenuated logical chain there, that this evidence would have led to a mini-trial over the sanitation plan and the FDA's current good manufacturing practice regulations, which was something that the... We just couldn't go down that road is what Judge Brown found. And then what he did there was rule without prejudice that if the defense had any specific evidence that they wanted to put on a trial that, you know, that may actually inform the disputed issues, then he would consider it a trial. And that's exactly what happened. We considered it a trial. We argued it again. He had already seen the government's case. He was in the vantage point of having seen what the evidence was. And he decided that based on the attorney proffer, which we obviously hadn't seen, it had been filed ex parte at the time, that this evidence, you know, was not relevant. And he also... He based his ruling really on Rule 403 and then on Rule 401. He said this is a road under Rule 403 as well as ordinary relevance that we need not go down. Moving on to the... Well, I also wanted to make a point about this. Ms. Richardson's testimony, I think that what it really related to was the collateral attack on the order that the defense tried to make in closing. I mean, the defense as it was actually presented, there were really very few factual disputes in this case. And the defense as it was presented was essentially that FDA was being intransigent, that FDA didn't approve the sanitation plan in time, and that FDA did that in bad faith. And Ahmaud D'Souza's testimony was focused on that concept. But, you know, it's black-letter contempt law that you can't, inside the context of a criminal contempt proceeding, attempt to attack the wisdom or validity of the underlying order. You're addressing the instruction, is that...? Well, I was trying to address Mary Richardson, but I can move on to the instruction. I thought you were. I'm sorry. Well, my point there was that Ms. Richardson's testimony would have been relevant to a defense that attacked the wisdom and validity of the consent decree. I would concede that. And the wisdom and validity of FDA's actions under the consent decree. But that's not part of this case. And that's what Judge Brown, in his discretion, recognized. Moving on to the jury instruction issue. I think here that, first of all, I don't think that they raised the issue with the model jury instruction in the district court, because there were dueling submissions of jury instructions. But when we agreed upon jury instructions, this language about making misrepresentations was in the agreed-upon jury instructions. And then when we went on the record to talk about what the objections were, there were two objections to the agreed-upon instructions. There was the objection about the language from this court's opinion in Tabor, which was about the implausibility of the mistaken construction of the court order. So this is a plain error review? I think we're on plain error for that issue, yes. For the issue that Ms. Van Hoke covered in depth about whether misrepresentations are inconsistent with good faith. Let me ask you about the instruction itself. It seems like the jury found that any of the defendants had made a false statement, no matter how petty, no matter how substantial. That essentially would undercut the good faith defense that the defendants argued about, and was a substantial part of the entire defense. Well, I think that the key language there is it would undercut it, but not eliminate it. And I think that this question was before the jury. And as I point out in my brief, these misrepresentations that were put on, there's clearly a nexus between these misrepresentations and the violations of the court order. Is this a model charge? It is. That language is from the Third Circuit model instruction. Does the model charge require objective good faith? And if it does, isn't that a problem? I don't believe that's a problem. Let me get into that issue. I think the defense has sort of offered a false premise here, which is that this language from this court's opinion in Tabor actually imports an objective standard in what should otherwise be. That's the argument. Yeah, that's the argument. And I don't think that that's accurate. What this language is saying, and this language is of considerable vintage, and I cited a bunch of cases, and it really comes from the Seventh Circuit's opinion in Greyhound Lines, which is the exact same factual context, essentially, that we have here. Which was called into question. Right. And so what I think this language means is, and I think this is really the only thing that the jury would have taken this language to mean, is that if you come into court and say, well, yes, there's a court order saying don't do X, I did X. But what I really thought it meant was don't do Y. What the Seventh Circuit said in Greyhound and what this court said in Tabor is that, yes, we're going to give you a good faith defense in the context of criminal contempt, but not if nobody could have plausibly believed the construction of the order that you now claim to have labored under. And I think that in any sort of willfulness context, a jury, first of all, we don't encourage fact finders to adopt or credit implausible testimony or arguments or defenses. And so here, I think this language is simply confirming the idea that in the context of criminal contempt, we're not going to credit an implausible reading of a consent decree. And Cheek doesn't hold otherwise? I don't think so. I think that there's a procedural problem first, in that this panel is bound by Tabor unless there's intervening Supreme Court precedent. Well, except Tabor can't overrule Cheek. Tabor can't overrule Cheek, but also, you could argue that the Tabor panel would have been more cognizant of Cheek than a panel today, in that I think prior panels of this court are presumed to have acted rationally and with notice of binding Supreme Court precedent. But I don't think that Cheek actually goes as far as the defense says it does. There's the statement in there that an objective, what is it, a subjective intent not to violate the law is inconsistent with willfulness. I think that's a paraphrase of the language that they're basing this on. And I think that our language here is, I think it's consistent with Cheek, for the reason that I just described, in that plausibility, even if there's a slight objective component to that, in any case where the government needs to prove willfulness, the jury needs some kind of objective basis, some kind of anchor, to be able to determine how it evaluates a defendant's good faith defense. I mean, any fraud defendant can get on the stand and say, yes, I took his money, I lied to him, but I didn't really mean to defraud him because I believed whatever. And in that sort of context, a jury can say, yes, we're not going to credit that testimony because it's implausible that this guy took these steps with the intent that he's claiming to have. And I think that that's what this language is confirming. Can I ask you, maybe you want to touch on the closing statements, but I also, before you leave, I want to talk to you about this sentencing enhancement. Why don't you deal with the closing statement first? Okay. On the closing statement, the court expressed some concern about the use of the word disgusting, and I'm not going to stand up here and... Words for disgusting and ridiculous were probably the ones that were focused on. Yes. And the court expressed concerns about those words. I understand that. I'm not going to sit up here and say that disgusting is a word that should be used all the time in closing statements. What I am going to say is that in the context of this trial, which was a hotly contested trial, the problem that the government had with the defense closings was that the defense case had corroborated what the government witnesses said, not just to a large extent, but almost to 100% of what these government witnesses said. Gina Gimenez and Balou Advani got most of the discussion here, so I'll talk about Balou Advani. Balou Advani testified consistently that he wasn't paying these people in the back room and that he did a favor for his friend, Mohamed Desoki. That was his testimony. It was consistent. They attacked him as, well, maybe you did pay these people. Maybe you did this and such and such with this operation that was in your back room. And what happened in the defense case was that the defendants put on employee witnesses who testified that they were paid cash, or at least one of them was paid cash by QFL to go there. Then Ahmad Desoki got on the stand and said that he did an end run around the consent decree, essentially, by paying cash to the employees, even though he intended to have ADH do it. Now, the problem with arguing, with spending a whole bunch of time accusing the government of misconduct in closing after you've just corroborated these witnesses' testimony, is that, first of all, it's not based on the record. Secondly, it gives the jury a false understanding of, essentially, the judicial system, because these witnesses are coming into court and telling a true story, and the defense has essentially corroborated what they say. Then defense counsel gets up in closing and accuses an agent of singing a song the prosecutors wanted him to sing and things like that. In that context, you can see how the invited response doctrine really does apply here. On the enhancement. Yes. You've got the three-level enhancement for Omar and Ahmad, and it's an enhancement if a defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive. A participant is somebody who's criminally responsible. Karpati and Cooney were not criminally responsible. There was testimony that Karpati and Cooney knew of the decree, had notice of it, and still took actions that were inconsistent with it. It's kind of a stretch. They weren't indicted, were they? They were not indicted, but they were not indicted. But in terms of the court's sentencing discretion, the court could have found from the evidence that Cooney and Karpati were well aware. Did the court make that finding at the sentencing? I don't believe the court made a specific finding about five participants, no. But the court did. This issue was briefed before the court, and I don't think the court needs to say exactly to identify the five participants in the activity at sentencing. But in terms of Cooney and Karpati, there was evidence that they – I mean, I think there was evidence that Cooney drove employees up to the other facility. There was evidence that Karpati brought or caused raw materials to be brought back to the Patterson facility. There was also evidence that they participated in a meeting where they decided to engage in this endeavor. I think that that's enough for the district court to have found that. But they are criminally culpable. I mean, was there any thought given to whether you should indict them? There was thought about that. And you decided not to do it. And there was nothing at the sentencing that really shows that they were criminally responsible or criminally culpable, was there? Well, there was evidence that adduced a trial that was cited in our sentencing brief, the evidence that I just described. I think that's enough for the district courts in its sentencing discretion to find that there was – Usually what happens is when somebody's part of a conspiracy or something like that, but, I mean, this seems to – I don't know of any cases that really deal with this. Well, I think that it's an issue that we've seen fairly often in my office because there's a lot of cases where defendants argue that – essentially a similar factual scenario here of where an offense includes a lot of people who may or may not be participants. So here there were a lot of people who were up there violating the consent decree, but the government has chosen very specifically not to call any of the QFO hourly employees participants. But in this case, there were people who were other than those people who were violating the consent decree. There were Cooney and Carpotti, and those are the ones who we've identified. If the court finds that insufficient, then it's insufficient. All right. Thank you very much. Good. Any other questions? No. Good. Thank you. Thank you. Thank you very much, Mr. Ruckel. Mr. Solano? Your Honor, with the correct permission, I'm going to defer my time to Ms. Van Hoek. Okay. Ms. Van Hoek? Thank you again. If I may deal with the sentencing, I mean, the point. Sure. Were Carpotti and Cooney – can they – if they knew what was going on and they were participating, couldn't a sentencing judge say, look, well, even though they weren't indicted, they were part of the plan to get around this consent decree? And I'm going to find that Omad and his brother Omar and Omad were supervising them. Well, I don't believe that the record supports such a finding, but I think that there's another piece to the analysis under 3B1.1, which is even more important than that piece. So assume, as you just did, that there are five participants or that it's otherwise extensive. And the next question is, did Omar DeSocchi and then Omad DeSocchi direct that criminally culpable person to do criminal activity? And the record is absent of any evidence of either defendant, but there's very little evidence of Omar DeSocchi. Not circumstantial evidence? That he directed? No. There is no evidence whatsoever with respect to Omar DeSocchi that – there is evidence that one of the employees testified that in the hierarchy of managers that Omad and Omar were above Carpati and Cooney in his mind's eye of what the organizational chart would look at, one of the hourly employees. However, I think that the error here was to use Omar and Omad DeSocchi's role in their du jour roles, their roles in a legitimate business as supervisors, and import that into the criminal activity. And I think that the case on point is the one in our brief, United States v. DiGiovanni. In that case, a police officer, criminal defendant, was a sergeant or had some rank, a du jour rank. In his everyday life, he was a supervisor. But when a number of police officers were doing a criminal activity together, there was no evidence that he held a supervisory role in that capacity. Wasn't there evidence, though, that all the employees were notified of the consent decree and what it prohibited and what it said? But that would not be, say, for example, Omar DeSocchi telling an employee that there's a consent decree and you're not allowed to – we're not allowed to manufacture here. That, in turn, doesn't translate Omar DeSocchi saying to that person, I want you to now violate the decree. Omar DeSocchi had nothing to do with the day-to-day operations. I understand that. But somebody instructed then these individuals to drive employees up to conjures and some of the other actions. Dr. Mohamed DeSocchi did not contest the leader-organizer role. And it would be he really – the evidence came out that it was really his company and he would have been the person directing. The DiGiovanni case talks about the supervising the illegal conduct of another or exercising management responsibility over the property assets or activities of a criminal organization. I mean, it's – maybe it's a stretch, but it would seem that if they're actually supervising, maybe as a result of a general plan of their father, but if they're supervising this end-around, as your opponent calls it, why could they not get the three-level enhancement? There is some evidence that Ahmad DeSocchi was in a supervisory role, obviously. I think he still wouldn't get it because I don't know that you could find those two other managers criminally culpable. But Omar DeSocchi did not occupy such a role. He was not a manager of anyone. He was writing – the testimony is very clear. He's working actually with Mary Richardson, the expert hired, and all he's doing is writing SOPs and working on the sanitation plan and doing those things. He's not managing anything. He's not directing anything. Very, very briefly, Judge Fuentes asked a question with the jury charge. Well, two questions. The first is, does the charge as written regarding a misrepresentation or a material omission, does that either undercut the good faith defense or does it eliminate it? And my adversary said he believed it undercut. The way it was written, it unquestionably is written in the alternative. Even if a defendant has a good faith, honestly held belief, he's not violating the law, he's not entitled to the defense. The words are very clear. Obviously, the court could have instructed that whether or not there was an omission, whether or not someone made a misrepresentation, it could go to credibility. That was not the instruction here. It was not an undercut. It was an elimination. The court also asked about the objective standard and whether or not there's a problem with injecting an objective standard into the good faith defense. And, again, my adversary suggested that there needs to be something by which the jury judges the credibility of someone's stand and say, well, I really thought it was true or something like that. There is a difference, just as there is with respect to the first error with the charge. There is certainly a difference with using what a juror brings to the table with respect to common sense in determining credibility of a witness, in determining do I believe him. Not every defendant that takes the stand that says, I honestly thought I was doing the right thing, I did the right thing, is telling the truth. Some are and some aren't. And the juror is the arbiter of that and decides what weight or credibility to give. But just as with the other language that we claim error, this language also is written that you must find both. And that's the problem when you look at Cheek. The language is not only does it have to be honest, it also must be plausible. So an unreasonable, honest belief does not entitle a defendant, at least in this case given this charge, to a good faith defense. And what that results in is that all these defendants were deprived of their Fifth and Sixth Amendment rights, one to due process and six to a jury, determined beyond a reasonable doubt every element of the offense. Thank you. Any other questions? Thank you, Ms. Van Hoek. The case was very well argued. We'll take the matter under advisement.